IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HILLERY W. GILLE,
          Plaintiff,

                                        CV 10-705-PK

                                        FINDINGS AND
v.                                        RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,
                 Defendant.
_____

PAPAK, Magistrate Judge:

        Plaintiff Hillery Gille filed this action on June 6, 2010 seeking judicial review of two

final decisions of Commissioner of Social Security denying her application for supplemental

security income ("SSI") under Title XVI of the Social Security Act (the "Act"). Although Gille

filed a single application for benefits, the Commissioner addressed the time period pertaining to

Gille's childhood in his first decision, and the period pertaining to Gille's adulthood in a second

decision. This court has jurisdiction over Gille's action pursuant to 42 U.S.C. §1383(c). Gille

argues that the ALJ made contradictory findings concerning her alleged somatoform disorder and

failed to properly develop the record by rejecting her request for an updated psychological

evaluation.  I have considered the parties briefs and all of the evidence in the administrative

record.  For the reasons set forth below, the Commissioner's childhood decision should be

reversed and remanded for a finding of disability and an award of benefits and the

Commissioner's adulthood decision should be affirmed.

## CHILD DISABILITY ANALYSIS FRAMEWORK

To establish eligibility for benefits, a plaintiff has the burden of proving an inability to

engage in any substantial gainful activity (SGA) "by reason of any medically determinable

physical or mental impairment" that has lasted or can be expected to last for a continuous period

of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  Additionally, for the purposes of SSI,

a plaintiff has the burden of proving disability prior to the termination of his or her insured status.

*Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).

The Commissioner has established a three-step sequential evaluation process for

determining if a child is eligible for SSI benefits.  20 C.F.R. § 416.924(a).  First, the ALJ must

determine whether the child has engaged in substantial gainful activity (SGA).  *Id.*  If so, the

child is deemed not disabled and the inquiry ends.  *Id.*  If the child has not engaged in SGA, then

the ALJ must determine whether the child suffers from a severe impairment or combination of

impairments that is severe.  *Id.*  An impairment is not severe if it is a "slight abnormality or a

combination of slight abnormalities that causes no more than minimal functional limitations." 20

C.F.R. § 416.924(c).  If the child does not have a severe impairment, the inquiry ends; if the child

has a severe impairment, the evaluation proceeds to the third step.  At the third and final step, the

ALJ must determine whether the child's severe impairment meets, medically equals, or functionally equals, one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 416.924(a), 416.925.  In making that determination, the ALJ considers all the relevant evidence in the case record, including objective medical evidence, relevant information from other sources, such as teachers, family members, or friends, and the claimant's statements, including statements from the child's parent(s) or caregivers.  S.S.R. No. 09-2p, 2009 WL 396032, at *11.  If the ALJ finds that the impairment meets or equals a listing, then the child is deemed disabled.  20 C.F.R. § 416.924(d).

An impairment functionally equals a listing when it results in "marked" limitations in two of the six domains of functioning, or an "extreme" limitation in one domain.  20 C.F.R. §416.926a (listing the six domains as: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being).  A marked limitation is one that seriously interferes with the child's ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2)(i).  An extreme limitation is more than marked, and is one that very seriously interferes with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i).

## ADULT DISABILITY ANALYSIS FRAMEWORK

The Commissioner has established a five-step sequential process for determining whether an adult claimant is eligible for SSI benefits.  *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. 416.920(a)(4).  At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner.

FINDINGS AND RECOMMENDATION- Page 3

*See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 416.920(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 416.920(a)(4)(i), 416.920(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. §416.920(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 416.920(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. § 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical and mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. §416.945(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

 At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, some individuals limited by physical impairments to sedentary or light work must be found disabled, depending on their age and vocational education level. 20 C.F.R. § 404, Subpt. P, App. 2. The so-called "grids" contained in Tables 1 and 2 of Appendix 2 to Subpart P of Section 404 set forth the criteria for determining whether such a nondiscretionary finding must be made. In the event the grids do not mandate a finding of "disabled," the ALJ considers the RFC in relation to the claimant's age, education, and

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

work experience to determine whether the claimant can perform any jobs that exist in significant

numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§

416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. If the Commissioner meets his burden to

demonstrate that the claimant is capable of performing jobs existing in significant numbers in the

national economy, the claimant is conclusively found not to be disabled. *See Bowen*, 482 U.S. at

142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. A claimant will

be found entitled to benefits if the Commissioner fails to meet his burden at the fifth step. *See*

*Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied

proper legal standards and his or her findings are supported by substantial evidence in the record.

*See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193

(9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a

preponderance; it is such relevant evidence as a reasonable person might accept as adequate to

support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing*

*Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports

and the evidence that detracts from the Commissioner's conclusion." *Id.*, *citing Reddick v.*

*Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of

the Commissioner. *See id.*, *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir.

2006). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence

may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d

747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## BACKGROUND

Plaintiff Hillery Gille was born on April 13, 1988.  Tr. 114.  On May 12, 2005, when Gilles was 17 years old, she filed an application for SSI benefits as a child alleging disability onset on October 1, 2001.  Tr. 115-120.  Gille asserted that she suffered from anemia, arthritis, asthma, anxiety, depression, hypoglycemia, mood swings, pain disorder, "permanent disabling injuries" to her ankle, feet, back, fingers, hands, and shoulders, pleurisy, post-traumatic stress disorder, and polysystic ovarian syndrome.  Tr. 132.  Gille noted that because of these conditions, she experienced constant fatigue, heart palpitations, limited mobility, restricted physical activity, inability to sit or stand for long periods, diminished focus from headaches, sleeplessness, weakness, depression, panic attacks, and food and medicine allergies.  Tr. 132-133.

The Commissioner denied Gille's claim initially on August 31, 2005, and again on reconsideration on January 12, 2006.  Tr. 100, 105.  On March 19, 2008, a hearing took place before Administrative Law Judge (ALJ) Charles S. Evans in Portland, Oregon.  Tr. 978-1017.  Since Gille's claim encompassed a period during which Gille was a child as well as a period during which she was an adult, the ALJ issued two separate decisions.  The first covered the period from the date of Gille's application of May 12, 2005 to April 13, 2006, when Gilles turned 18, and applied the three-step sequential evaluation process described in 20 C.F.R. § 416.924(a)-(d).[2]  Tr. 12-24.  The second covered the period from April 13, 2006 until the date of the hearing,

---

[2] Despite Gille's allegation of disability onset beginning October 1, 2001, the ALJ noted that the earliest possible disability onset date was Gille's application date of May 12, 2005.  Tr. 15.  Indeed, SSI claimants are not eligible for benefits "for any period that precedes the first month following the date on which an application is filed." 20 C.F.R. § 416.501.

FINDINGS AND RECOMMENDATION- Page 7

and applied the five-step sequential evaluation process described in 20 C.F.R. § 416.920(a)(4), (b)-(g).  Tr. 25-36.  In the first decision, the ALJ found Gille not disabled as a child.  Tr. 24.  Likewise, in the second decision, the ALJ found Gille not disabled as an adult.  Tr. 35.  The Appeals Council declined review, and Gille initiated this action.

## I.    Medical History

### A.    Childhood

Although the relevant period for Gille's SSI application is from May 12, 2005 to March 19, 2008, my review of the medical record starts much earlier to trace the evolution of Gille's various medical conditions.  In 1995, Gille's teachers and her mother suspected she suffered from attention deficit disorder.  Tr. 179.  Although school staff observed Gille that year, it was not until December 1998 that Clackamas County Mental Health diagnosed her with Attention Deficit Hyperactivity Disorder (ADHD).  Tr. 175, 876.  During 1998 and 1999, Gille had approximately 15 visits with mental health providers concerning her ADHD.  Tr. 877-888.  In June 1999, school staff created a student accommodation plan ("504 plan") to address Gille's ADHD symptoms, which interfered with her "on-task behavior, organization, and work completion."[3]  Tr. 171.

In 2001, providers first diagnosed Gille with several other medical problems.  In January 2001, Gille's nurse practitioner Dr. Richards diagnosed Gilles with mild diffuse thyromegaly, an abnormally enlarged thyroid.  Tr. 519.  After Gille complained of irregular menses in July 2001,

---

[3] Gille's 504 plan remained active into her high school years.  Tr. 159-170.  For example, in December 2004, school staff noted that Gille was easily distracted, had trouble with organization, had difficulty with stairs and transitions between buildings when her asthma was bad, and missed school because of her "condition."  Tr. 159.  Gille testified that she missed approximately one or two days a week of school in high school due to being sick, but graduated despite having less than the normal number of credits.  Tr. 982-983.

Dr. Richards began to suspect polycystic ovary syndrome. Tr. 517. The next month, a pelvic ultrasound revealed the presence of an ovarian cyst. Tr. 740. In September 2001, Gille complained of chest pain, which Dr. Richards treated as gastroesophageal reflux disease (GERD). That same month, Dr. Richards also first noted Gille's "multiple somatic complaints," including nausea, heachaches, body aches, sore throat, sinus popping, and eye pain, which he doubted were "infectious [in] origin." Tr. 509.

Starting in January 2003, Gille began visiting the emergency department and her new nurse practitioner Dr. Susan Fee approximately once per month complaining of various ailments, including abdominal pain, chest pain, joint pain, headaches, allergies, and abrasions. Tr. 408, 410, 416, 421, 472-473, 724, 729, 732. In November 2003, Dr. Fee referred Gille for an evaluation by Dr. John Griffin, a rheumatologist. Gille reported a long list of complaints including weight gain[4], abdominal pain, ovarian cyst, thyroid problems, asthma, urinary tract infections, heartburn, reflux esophagitis, post-traumatic stress disorder following September 11, 2001, and joint aches. Tr. 561. At that point, however, Gilles reported being able to bathe, dress, and care for herself. *Id.* Although Gille's mother feared that Gille suffered from systematic lupus erythematosus ("SLE" or "lupus"), Dr. Griffin found that Gille did not meet the diagnostic criteria for lupus. Tr. 565. After completing lab work and a bone scan, Dr. Griffin reaffirmed that Gille likely did not suffer from lupus. Tr. 562-563. During the first half of 2004, Gille continued to frequently visit the emergency department and Dr. Fee complaining of a wide range of symptoms, including pain and achiness. Tr. 404, 405, 413, 452, 454, 559-562.

In June 2004, Gille's mother brought her in for a mental health assessment after Dr. Fee

---

[4] At the examination, Gille weighed 228 pounds.

preliminarily diagnosed Gille with depression and started her on Zoloft.  Tr. 655-671.  Gille's

mother told a Clackamas County Mental Health psychologist that Gille "likely may" have lupus

and sought help for Gille to "learn how to deal with the knowledge of having such an illness."

Tr. 667.  Gille's mother also reported that several previous medical providers told her and Gille

that they both had somatization disorders and that they "feed off each other." *Id.*  Gille herself

reported feeling anxious and "worry[ing] about everything." *Id.*  Consequently, Clackamas

County Mental Health diagnosed Gille with Depressive Disorder NOS.  Tr. 666.  Over the next

six months, Gille participated in a few sessions of individual, group, and family therapy.  Tr. 889,

890.  Meanwhile, Gille continued to seek treatment from her primary care providers for joint pain

and thyroid problems and from an OB/GYN for her polycystic ovary syndrome.  At one

particular visit on January 12, 2005, Dr. Richards discussed with Gille his "high suspicion for

somatization disorder and possibly some anxious depression."  Tr. 502.  He encouraged Gille's

mother to take Gille in for a thorough psychological work-up, and she reported vaguely that Gille

was in counseling.  *Id.*  Two days later, however, on January 14, 2005, Gille's mother withdrew

her from mental health treatment.  Tr. 652.

On the next several months, providers searched unsuccessfully for objective evidence of

Gille's elusive symptoms.  An echocardiogram found only a trace of pulmonary insufficiency, but

was otherwise normal. Tr. 523, 567.  During an emergency department visit for abdominal pain,

a CT scan of Gille's abdomen and pelvis was normal.  Tr. 431-433.   At the same time, Gille's

primary care provider emphasized the need for Gille to reduce her weight through exercise, since

she weighed 247 pounds.  Tr. 499.

On May 27, 2005, Gille and her mother completed a child function report concerning

Gille's abilities and limitations.  Gille listed no limitations in learning.  Tr. 127.  She reported

being able to walk, throw a ball, and work video game controls, but could not run, dance, swim,

ride a bike, drive a car, jump rope, or play sports.  *Id.*  Socially, Gille stated that she had a few

friends her age but had difficulty making new friends, and related well to adults and siblings but

not to her teachers.  Tr. 128.  Additionally, Gille reported being able to take care of personal

hygiene, laundry, cooking and homework, but could not help around the house, get to school on

time, use public transportation, or take her medication.  Tr. 129.  Gille stated that she sometimes

needed help washing her hair because of limited mobility in her arms with flare-ups and could

not help with household chores because she "doesn't really have the strength to do too much."  *Id.*

 Gille was able to work on art projects and keep busy on her own, but did not finish tasks,

complete homework, and do chores on time.  Tr. 130.  Finally, Gille stated that she had difficulty

walking, washing her hair, carrying a backpack, going up or down stairs, running, playing sports,

doing PE, sitting or standing for long periods of time, focusing, sleeping at night, and tolerating

florescent lights, sun, and loud noises.  Tr. 132.

      In June 2005, Gille apparently reinitiated mental health treatment with Clackamas County

Mental Health, participating in individual and family therapy.  Tr. 642, 645, 646-651.  Gille and

her therapist frequently addressed Gille's internet usage, which Gille's mother felt interfered with

Gille's health, chores, family relationships, and school work.  Tr. 641, 893, 894.  In one session,

Gille made a plan to increase the time she spent doing household chores.  Tr. 641.  In another

session, Gille's mother reported permitting Gille to use the internet between 6:00 PM and 3:00

AM on Friday and Saturday, but prohibiting internet use on Sunday.  Tr. 893.

      On August 8, 2005, Dr. David deVidal evaluated Gille at the request of Oregon Disability

FINDINGS AND RECOMMENDATION- Page 11

Determination Services, focusing on allegations of depression, anxiety, and PTSD. Tr. 614.

After a mental status examination and review of records, Dr. deVidal diagnosed Gille with

Somatoform Disorder NOS, Mood Disorder NOS with mild depression and mild to moderate

anxiety, Posttraumatic Stress Disorder, mild to moderate, and allegations of ADHD by parent

report. Tr. 618. deVidal also noted that "[t]here appears to be a significant degree of

somatization going on, both with Hillery and her mother, and I would concur with previous

clinicians who said that mother and daughter fed off each other." *Id.* At the same time, deVidal

stressed that his diagnosis of somatization disorder was qualified, observing that Gille "has some,

although perhaps not all, of the requirements for somatization disorder, including four pain

symptoms, two gastrointestinal symptoms, not intentionally produced and probably beyond what

can be demonstrated by objective medical data." *Id.*

On August 29, 2005, non-examining state agency medical consultants Dr. Martin Lahr,

M.D., and Dr. Robert Henry, a psychologist, assessed Gille as having no limitation in three

functional domains (acquiring and using information, attending and completing tasks, and

moving about and manipulating objects) and less than marked limitations in the other three

domains (interacting and relating with others, caring for yourself, and health and physical well-

being). Tr. 493-494. Because Gille did not have either marked limitations in two domains or an

extreme limitation in one domain, the consultants determined that Gille's impairments, although

severe, did not functionally equal the listings. Tr. 491.

Regarding the domain of interacting and relating with others, the assessment noted that

Gille reported having some friends and was able to establish good rapport at evaluations. Tr.

493. Regarding the domain of caring for yourself, the assessment acknowledged Dr. deVidal's

observation of a "significant degree of somatization," yet found that although Gille reported

aches and pains in visits to her doctors and the emergency department, there was no evidence

supporting a functional limitation.  Tr. 494.   Finally, regarding the domain of health and physical

well-being, the assessment again remarked on Gille's somatization disorder, but noted that Gille's

asthma and GERD were stable with treatment, that Gille had never been diagnosed with lupus,

that x-rays revealed no evidence of arthritis, and that her multiple complaints of aches and pains

were insufficient to establish a functional limitation.  *Id.*  The assessment also reviewed Gille's

medical record, documenting various complaints that could not be objectively verified.  Tr. 496-

497.  Perhaps due to Dr. deVidal's diagnosis of somatization disorder, the assessment found

Gille's statements to be "overall credible."  Tr. 497.

On December 20, 2005, Gille's mother completed another questionnaire concerning

Gille's abilities and limitations with responses very similar to the previous report in May 2005.

Gille's mother stated that Gille could prepare some meals, change the cat's water, and put away

clean dishes, but needed help washing her hair, cleaning up her room, and remembering to take

her medications.  Tr. 209-214.  Also, Gille apparently could only walk 10 feet before needing to

stop and rest for two minutes.  Tr. 214.  Gille's mother also completed a pain questionnaire,

stating that Gille suffered constant pain all over her body that was exacerbated by walking,

standing, sitting, and climbing stairs.  Tr. 217.  Similarly, Gille's mother filled out a fatigue

questionnaire asserting that Gille needed one or two naps a day, could not stand for more than 20

minutes, and could not walk or exercise.  Tr. 220.

On January 11, 2006, another set of non-examining state agency medical consultants

reaffirmed the agency's previous assessment.  Dr. Linda Jensen, M.D., reviewed Gille's reported

limitations– fatigue, inability to stand for more than 20 minutes, inability to walk or exercise, sleepiness during school, needing assistance bathing– but found that Gille "has a [history] of aches and pains but no severe physical limitations and no functional problems related to the same." Tr. 672. Dr. Dorothy Anderson, Ph.D., noted Gille had friends, used the computer, performed well in school, and participated in mental health treatment, but found Gille's reported inability to complete almost all household chores inconsistent with her statements in therapy that she spent too much time on the internet instead of doing chores. Tr. 673. Dr. Anderson also opined that previous provider's remarks that Gille and her mother "feed off each other isn't far from the truth." *Id.*

In February 2006, Dr. Richards referred Gille for a consultation with the Dr. Greenberg of the Northwest Cardiovascular Institute for Gille's ongoing complaints of chest pain and difficulty breathing. Tr. 910. After an initial examination, Dr. Greenberg suggested that Gille's chest pain and shortness of breath were related to cardiovascular deconditioning and "some element of anxiety," not a cardiovascular condition. Tr. 911. Indeed, an exercise treadmill test and echocardiogram confirmed that Gille's heart was "structurally normal" and there was no evidence of coronary artery disease or arrhythmia. Tr. 912. Overall, Dr. Greenberg recommended Gille exercise on a regular basis to lose weight for her general health. *Id.*

### B.    Adulthood

In April 2006, after turning 18, Gille decided not to continue with mental health treatment, expressing that she felt she had adequate coping skills. Tr. 815. While her mother encouraged her to continue with some form of counseling, Gille was "somewhat resistant" but agreed to explore other options for treatment. *Id.* Gille, however, failed to attend her follow-up

FINDINGS AND RECOMMENDATION- Page 14

appointment in May 2006.   In September 2006, Gille's counselor discharged her, noting the

reason for discharge as "Treatment Complete."  *Id.*  The counselor noted that Gille "is now 18

and able to make her own choices" and that she could seek services in the future if she desired.

Tr. 816.

During the second half of 2006 and into 2007 Gille continued to frequently visit the

emergency department complaining of pain, nausea, skin rash, abrasions, migraines, and vision

loss.  Tr.  684, 689, 694, 699, 704, 709, 714, 808, 810.   In August 2006, Dr. Richards referred

Gille to Dr. Lew, a gastroenterologist.  Tr. 913.  Gille reported heartburn for the past five years,

chest tightness, and almost daily nausea.  Tr. 914.   Dr. Lew prescribed Nexium for acid reflux

and ordered an esophagogastroduodenoscopy, an endoscopic examination of the esophagus and

stomach.  *Id.*   The procedure revealed some retained food but no esophagitis (inflamation or

irritation of the esophagus).  Tr. 916.

## II.    Hearing Testimony

### A.    Gille

Gille testified about various alleged medical and psychological conditions, including

panic attacks, anxiety, attention-deficit disorder, depression, polycystic ovarian syndrome,

headaches, arthritis, lupus, allergies, obesity, crying spells, dizziness, nausea and the functional

limitations caused by those conditions.

Gille stated she has a major panic attack at least once a week lasting one to two hours and

smaller attacks daily lasting five to 15 minutes.  Tr. 981.   During major panic attacks she

becomes non-functional.  Gille also suffers from anxiety, which causes her to have difficulty

being around large groups of people.  *Id.*   She can go to the grocery store on a good day, but she

mostly stays home because she gets "worked up" around people.  Tr. 982.  Gille was diagnosed with attention deficit disorder at age 10 and, as a result, had trouble finishing assignments and working in class.  Tr. 984.  Gille has also been depressed since she was 10 years old.  *Id.*  Her depression causes her to want to sleep or stay in bed and avoid going outside or being around her family.  Tr. 984-985.  She used to take Zoloft, but discontinued that medication because it aggravated her acid reflux.  Tr. 985.

Gille first developed polycystic ovarian syndrome when she was 10 years old, which caused irregular menstrual cycles, growth of facial hair, excessive growth, and discoloration of the skin.  Tr. 985.  Gille has problems with asthma, which causes her to be winded when moving around the house and to use an inhaler with exercise.  Tr. 985-986.  Additionally, Gille suffers headaches approximately four to five times per week, with "larger" headaches a few times per week lasting one to three hours.  Tr. 986-987.  The more severe headaches prevent Gille from bending down and impair her ability to focus "because it hurts, and I get spots in front of my eyes."  Tr. 987.  Gille suffers from arthritis, including pain and swelling in the joints of her ankles and feet, which prevents her from standing up for more than five to 15 minutes at a time.  *Id.*  The swelling occurs about four times per week and goes away with rest and elevation.  Tr. 987-988.

Gille started seeing a rheumatologist in 2002 for lupus, which causes chest pain when outside during the winter, sensitivity to sunlight, skin discoloration on the face and neck, and joint pain.  Tr. 988-989.  Gille testified that she suffers from allergies to dust, which make cleaning and going outside difficult.  Tr. 989-990.  She also described having heart palpitations during panic attacks, although walking and exercise also aggravate the palpitations.  Tr. 990-991.

FINDINGS AND RECOMMENDATION- Page 16

Gille has trouble with ringing in her ears that prevents her from sleeping at night.  Tr. 991. Gille sleeps five hours a night "at best."  Tr. 998.  She does, however, nap during the day three times a week; on good days the nap lasts two hours while on bad days it lasts three or four hours.  *Id.*  Gille also suffers from blurry vision and once lost vision completely in one eye for several minutes during a headache.  Tr. 992.

Gille now weighs 300 pounds and attributes some of her difficulties to her weight gain.  Tr. 992.  For example, she has a hard time getting in and out of bed, the car and the house.  *Id.*  She also hates going into public because she feels "totally hideous" and was teased at school because she could not fit into the chairs there.  *Id.*  Gille experiences crying spells about three times per month for about an hour, which force her to stay in bed.  Tr. 993.  She also is nauseous two or three times per week, lasting 15 minutes to an hour.  *Id.*  Additionally, Gille gets dizzy once per week for five minutes.  *Id.*

Functionally, Gille can stand for 10-15 minutes and walk two blocks before needing to rest.  Tr. 995.  She needs to get up and move every 20 minutes because of aching in her legs, pain in her back, neck, and shoulders, and swelling in her feet.  Tr. 996.  In an eight hour workday, she could stand for two hours and sit for three hours.  She could lift 15 pounds on good days, five pounds on bad days.  Tr. 995-996.   Gille has six or seven good days per month, but on bad days she stays in bed until 2:00 PM, gets into verbal fights with her mother, eats one or two meals, then returns to bed.  Tr. 996.  Gille can reach without difficulty, but cannot stoop, crouch, kneel, push a vacuum cleaner, or handle things with her fingers.  Tr. 1000-1001.  She also believes she would have difficulty making change with a cash register because of her hands.  Tr. 996-997.

### B.    Gillean Barrows

Gille's mother, Gillean Barrows, also testified before the ALJ.  She stated that Gille seemed to be in pain every day, rubbing her joints, hands, and ankles.  Tr. 1003.  Gille complained that she could not breathe, placing her hand over her chest.  *Id.*  Gille can walk only two blocks before resting.  Tr. 1002.  Her hands sometimes swell and she has difficulty lifting her arms above her shoulder or washing her hair.  *Id.*  She cannot tolerate washing dishes for more than five or ten minutes because of pain in her back and hands.  Tr. 1004.  Gille suffers an anxiety attack or panic attack five times per week lasting an hour or longer, which cause her to be non-functional.  *Id.*  She has four or five episodes of anger and irritability weekly lasting several hours.  Tr. 1005.  She also has crying spells lasting several hours.  *Id.*  Gille's ADHD impairs her ability to concentrate on work, making her distracted.  *Id.*  She also has trouble sleeping, usually staying up all night and sleeping during the day.  Tr. 1006.

### C.    Dr. Rullman

Dr. Rullman, M.D., a non-examining medical expert contracting with the agency, testified about Gille's conditions based on a review of medical records until 2006.  Tr. 1007.  Dr. Rullman evaluated her various physical complaints, finding some but not all to be supported by the medical record.  Dr. Rullman confirmed that Gille's polycystic ovary syndrome could cause some of her reported symptoms, including excessive hair growth, irregular menstruation, and obesity. Tr. 1008.  Gille's weight gain, from 242 pounds several years ago to 300 pounds at the time of the hearing, made it difficult to evaluate her complaints of shortness of breath and rapid heart rate.  *Id.*  Dr. Rullman, however, noted that Gille's rheumatologist could not confirm a diagnosis of lupus through lab results and ultimately opined that she likely did not have lupus.  *Id.*  Dr. Rullman acknowledged that even if Gille has asthma, which is extremely common among

FINDINGS AND RECOMMENDATION- Page 18

teenagers, it was not disabling.  Tr. 1009.   He also accepted her diagnosis of hypothyroidism, but noted that her lab studies were only minimally abnormal.  *Id.*

Dr. Rullman was more reticent in opining about Gille's psychological condition. He noted that her current complaints of agoraphobia were not emphasized in previous treatment records. Tr. 1009.  Dr. Rullman confirmed that Dr. deVidal diagnosed a somatical disorder.  *Id.*  Dr. Rullman, however, stated that he could not tell from the record what impact that disorder would have on Gille's activities of daily living or social functioning and was "not comfortable labeling [Gille] in terms of a psychological diagnosis." Tr. 1009, 1010.  Overall, Dr. Rullman found Gille's psychological problems "very significant" and suggested an additional psychological evaluation, but implicitly acknowledged that an additional evaluation would be unnecessary if a more effective evaluation had already been conducted but not included in records he reviewed.[5] *Id.*

### D.    Vocational Expert

The ALJ posed two hypotheticals to the vocational expert.  The first involved an individual who can walk two blocks, stand for half an hour, sit for an hour, occasionally lift 20 pounds or 10 pounds repetitively, does not relate well to groups of people, and suffers one panic attack per week lasting one hour.  Tr. 1010-1011. The vocational expert (VE) testified that she could not predict whether an employer would accommodate the one hour break resulting from a panic attack.  Tr. 1011-1012.  When posed with a second hypothetical eliminating the panic attacks, the VE identified two appropriate positions: small product assembler and semi-conductor

---

[5] At the end of the hearing, Gille's counsel requested the ALJ to order a more complete psychological evaluation.  Tr. 1016.

FINDINGS AND RECOMMENDATION- Page 19

electronics assembly.  Tr. 1012.

Gille's counsel posed several other variations of the AJL's original hypothetical.  The VE testified that an individual who had two or more panic attacks per week would not be able to remain competitively employed.  Tr. 1012-1013.  The VE noted that a person with nearly daily episodes of anger, including use of bad words and a raised voice, would probably be terminated. Tr. 1013.  The VE also testified that a person with unpredictable crying spells two or three times per month lasting hours could not sustain competitive employment.  Tr. 1013-1014.  VE stated that a person with memory, attention, and concentration problems caused by ADHD whose speed of repetitive tasks was less than half of normal would not be able to maintain employment.  Tr. 1014.  Finally, the VE testified that someone with fatigue requiring breaks of 30 minutes after five to 10 minutes of activity may or may not be able to maintain competitive employment, depending on the productivity level expected by her employer.  Tr. 1015.

## SUMMARY OF ALJ FINDINGS

### I.    Childhood Decision

At the first step, the Administrative Law Judge (ALJ) found Gille had not engaged in substantial gainful activity.  Tr. 18.  At the second step, the ALJ found that the combination of Gille's anxiety disorder, somatoform disorder, obesity, polycystic ovarian syndrom, and asthma was severe.  *Id.*  At the third step, the ALJ found that Gille's combination of impairments did not meet or equal any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1.  Tr. 18.  In particular, the ALJ found Gille had no limitations in the domains of attending and completing tasks and moving about and manipulating objects.  Tr. 20-21, 22.  The ALJ found Gille had less than marked limitations in the domains of acquiring and using information, interacting and

relating with others, and caring for yourself.  Tr. 19-20, 21-22, 22-23.   Finally, the ALJ found

Gille had marked limitations in the domain of health and physical well-being.  Tr. 23-24.

Accordingly, the ALJ found Gille not disabled under the Act from May 12, 2005 until April 13,

2006.  Tr. 24.

## II.     Adult Decision

At the first step of the five-step sequential evaluation process, the ALJ found that Gille

did not engage in substantial gainful activity since April 13, 2006, her 18th birthday.  Tr. 30.  At

the second step, the ALJ found that Gille's medical impairments of anxiety disorder, somatoform

disorder, obesity, polycystic ovarian syndrom, and asthma were "severe" for purposes of the Act.

*Id.*  At the third step, the ALJ found that Gille's combination of impairments was not the

equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1.  *Id.*  The

ALJ therefore assessed Gille as having the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567(b) modified in the following ways:
> limit walking to 2 blocks at one time; standing for 30 minutes at one time; sitting for 1
> hour at one time; no lifting of more than 20 pounds; no repetitive lifting of more than 10
> pounds; limited exposure to groups of people; and cannot drive.

Tr. 32.  At the fourth step of the five-step process, the ALJ found that Gille had no past relevant

work.  Tr. 34.  At the fifth step, the ALJ found in light of Gille's age, education, work experience,

and RFC that there were jobs existing in significant numbers in the national and local economy

that she could perform, including small product assembly and semi-conductor electronics

assembly.  Tr. 35.  Based on the finding that Gille could perform jobs existing in significant

numbers in the national economy, the ALJ concluded that she was not disabled as defined in the

Act from April 13, 2006 through the date of the decision, June 9, 2008.  Tr. 36.

///

FINDINGS AND RECOMMENDATION- Page 21

**ANALYSIS**

Gille challenges the ALJ's decisions on two grounds. First, Gille asserts that the ALJ erred in the decision covering her childhood by disregarding the impact of her somatoform disorder in assessing two of Gille's functional domains: attending and completing tasks and caring for yourself. Although I find no error in the ALJ's analysis of the Gille's capacity to attend and complete tasks, I find that the ALJ's evaluation of the "caring for yourself" functional domain was both contrary to law and unsupported by substantial evidence. Crediting evidence that the ALJ improperly rejected establishes that Gille has marked limitations in that domain and, therefore, her severe impairments functionally equal one of the listed impairments. Accordingly, the court should reverse and remand the Commissioner's childhood decision for a finding of disability and calculation of benefits for the closed period of Gille's childhood. Second, Gille contends that the ALJ erred in the decision covering her adulthood by failing to order an updated psychological evaluation, thereby basing his decision on a record that was inadequate for proper consideration. I disagree and find that the ALJ's decision covering her adulthood applied the proper legal standards and was supported by substantial evidence in the record. Therefore, the court should affirm the Commissioner's adulthood decision.

**I.    Childhood Decision**

I address the two functional domains in which Gille contends the ALJ improperly evaluated the functional limitations caused by her somatoform disorder.[6]

_____

[6] A somatoform disorder is a "mental disturbance [that] causes [an individual] to believe that her physical ailments are more serious than the clinical data would suggest." *Easter v. Bowen*, 867 F.2d 1128, 1129 (8th Cir. 1989). In other words, a somatoform disorder is a

### A.    Attending and Completing Tasks

In this domain, the ALJ considers "how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them." 20 C.F.R. § 416.926a(h).  Examples of limited functioning in this domain include:

> (i) You are easily startled, distracted, or overreactive to sounds, sights, movements, or touch.
> (ii) You are slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects.
> (iii) You repeatedly become sidetracked from your activities or you frequently interrupt others.
> (iv) You are easily frustrated and give up on tasks, including ones you are capable of completing.
> (v) You require extra supervision to keep you engaged in an activity.

20 C.F.R. § 416.926a(h)(3).

Here, the ALJ relied on the medical opinions of non-examining agency consultants Dr. Martin Lahr and psychologist Dr. Robert Henry, who checked a form indicating Gille had no limitations in this domain without providing any further comment.  Tr. 21, 493.  The ALJ also noted that Gille's "Global Functioning scores indicate her concentration is mild to moderately impaired at times but eventually she completes tasks and attends scheduled appointments."  Tr. 21.  Gille contends that the medical consultant's cursory assessment did not take into consideration the effects of her somatoform disorder.  For example, Gille cites her testimony that she has only six or seven good days per month, and that on the remaining bad days she is irritable

---

"psychiatric disorder which causes the sufferer to have a distorted perception of physical ailments."  *Metz v. Shalala*, 49 F.3d 374, 377 (8th Cir. 1995).

and remains in bed most of the day.  Tr. 995-996.  Further, Gille points to her testimony that she

cannot do housework and no longer engages in art and writing, activities she previously enjoyed.

Tr. 999.

     The Commissioner properly relies on medical and psychological consultants to make

findings of fact about the nature of a claimant's impairments and the severity of the functional

limitations they impose.  20 CFR §§ 404.1527(f), 416.927(f); SSR 96-6p.  Such reviewing

sources do not treat or examine the claimant.  Therefore, their opinions are held to stricter

standards and are given weight only to the extent they are supported by the record and consistent

with the record as a whole.  S.S.R. No. 96-6p, 1996 WL 374180.  The ALJ is not bound by the

findings of reviewing consultants, but may not ignore their opinions and must explain the weight

given to the opinions in their decision.  *Id.*  Thus, "[t]he findings of a nontreating, nonexamining

physician can amount to substantial evidence, so long as other evidence in the record supports

those findings."  *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996).

     There is ample evidence in the record supporting the consultants', and the ALJ's, ultimate

conclusion.  First, Dr. deVidal's evaluation, which the consultants summarized in their report,

found Gille suffered little impairment in attending and completing tasks.  Dr. deVidal noted that

Gille performed the serial threes test easily and the serial sevens test with only one mistake and

that her concentration was "fine."  Tr. 615.  Gille also completed several other challenging

cognitive tasks requiring extended attention, including remembering items and repeating strings

of digits forwards and backwards.  *Id.*  Moreover, although Gille reported difficulty finishing her

homework and chores on time, she also stated that she worked on arts and crafts projects.  Tr.

FINDINGS AND RECOMMENDATION- Page 24

130.  Further, Gille spent considerable stretches of time on the internet, an activity that she apparently enjoyed but, at least in her mother's view, interfered with her ability to complete chores and homework.  Tr. Tr. 641, 893, 894.  Although Gille reported that her ADHD limited her ability to pay attention, Tr. 214, the ALJ acknowledged and analyzed her attention-related impairments problems elsewhere in the decision, concluding that her limitations were minor and were not the cause of her academic difficulties.  Tr. 20.  Finally, Gille's hearing testimony in March 2008 that she cannot complete tasks because she is bed-bound three out of every four days does not necessarily demonstrate that she suffered the same limitation between May 2005 and April 2006, the relevant period for this analysis.  Indeed, in a December 20, 2005 report, Gille through her mother stated that a typical day involved going to school, eating lunch, resting, working on the computer, changing the cat's water, doing homework, and showering, not merely remaining in bed.  Tr. 209.   In sum, the ALJ properly relied on the consultants' evaluation because the remainder of the record supports their conclusion.

> **B.       Caring for Yourself**

In this domain, the ALJ considers "how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area."  20 C.F.R. § 416.926a(k).  A typically functioning adolescent in this domain:

> • Discovers appropriate ways to express good and bad feelings (for example, keeps a diary, exercises).
> • Feels more independent from others and becomes increasingly independent in all daily activities.

FINDINGS AND RECOMMENDATION- Page 25

• Sometimes feels confused about how she feels about herself.
• Notices significant changes in his body's development, which can result in some anxiety or worry about self and body (may sometimes cause anger and frustration).
• Begins to think about future plans (for example, work).
• Maintains personal hygiene adequately (for example, bathing, brushing teeth, wearing clean clothing appropriate for weather and context).
• Takes medications as prescribed.

S.S.R. No. 09-07p,  2009 WL 396029, at *6.  By contrast, examples of limited functioning in this domain include:

(i) You continue to place non-nutritive or inedible objects in your mouth.
(ii) You often use self-soothing activities showing developmental regression (e.g., thumbsucking, re-chewing food), or you have restrictive or stereotyped mannerisms (e.g., body rocking, headbanging).
(iii) You do not dress or bathe yourself appropriately for your age because you have an impairment(s) that affects this domain.
(iv) You engage in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or you ignore safety rules.
(v) You do not spontaneously pursue enjoyable activities or interests.
(vi) You have disturbance in eating or sleeping patterns.

20 C.F.R. § 416.926a(k)(3).

Here, the ALJ ultimately found Gille had less than marked limitations in the ability to care for herself.  Tr. 23.  Initially, he observed that "it was not certain" Gille has a somatoform disorder, then reviewed the various medical evidence in the record concerning Gille's somatoform disorder diagnosis.  *Id.* ("The medical expert at the hearing [Dr. Rullman] thinks she does, her treating therapist disagrees, and examining psychologist DeVidal cites somatization by both the claimant and the claimant's mother.").  Next, the ALJ noted that Gille relies on her mother's help in washing her hair because of pain when raising her arms above her head.  *Id.*  The ALJ found this allegation unconvincing, however, reasoning that "since the claimant's mother is 'disabled,' it begs the question who takes care of the household tasks."  *Id.*  The ALJ then

FINDINGS AND RECOMMENDATION- Page 26

concluded with the assertion that "the claimant as an adolescent and now as an adult cares for herself." *Id.*

The parties spend a great deal of effort disputing whether the ALJ "mischaracterized" the record concerning Gille's somatoform diagnosis and whether the ALJ actually found Gille suffered from that disorder. I agree with the Commissioner that the ALJ properly discussed the various expert opinions about Gille's somatoform disorder diagnosis and concluded, in Gille's favor, that she indeed suffered from that disorder. Tr. 18 (finding that Gille's combination of impairments, including somatoform disorder, was severe); Tr. 24 (commenting that Gille's greatest limitation is "her belief in her poor health despite evidence to the contrary"– essentially her somatoform disorder). This dispute over the ALJ's acceptance of Gille's diagnosis distracts from the more important question: whether the ALJ's findings about Gille's functional abilities pertinent to the domain of "Caring for yourself" applied the proper legal standard and were supported by substantial evidence in the record.

The ALJ's decision was deficient in both regards. First, the AJL erred by considering Gille's ability to wash her hair in the domain of "Caring for yourself." Social Security Ruling 09-07p clearly states that this domain "does not address children's physical abilities to perform self-care tasks like *bathing*, getting dressed, or cleaning up their room . . . . Rather, in 'Caring for yourself,' we focus on how well a child relates to self by maintaining a healthy emotional and physical state in ways that are age-appropriate and in comparison to other same-age children who do not have impairments." S.S.R. No. 09-07p, 2009 WL 396029, at *2 (emphasis added). Morever, even if Gille's physical ability to bathe had been a proper subject of the ALJ's inquiry,

FINDINGS AND RECOMMENDATION- Page 27

his reasons for rejecting Gille's testimony about her difficulty bathing were insufficient.[7]

Likewise, the ALJ's blanket assertion that Gille "cares for herself" is too vague to properly

support his finding in this domain.  It is unclear what evidence the ALJ relied upon to reach that

conclusion, and whether that evidence pertained to the functional characteristics relevant to the

domain of "Caring for yourself."  In fact, the ALJ's improper focus on Gille's physical ability to

bathe suggests that he did not focus on the relevant aspects of functioning in determining that

Gille "cares for herself."

Indeed, the ALJ completely ignored numerous pieces of evidence indicating that

Gille had at least a marked limitation in her ability to care for herself during her childhood.  *See*

20 C.F.R. §416.926a(e)(2)(i) (a marked limitation in a domain exists when "your impairment(s)

interferes seriously with your ability to independently initiate, sustain, or complete activities").

First, as Gille notes, sleeping and eating disturbances are among the examples of limited

functioning in this domain identified by the regulations.  *See* 20 C.F.R. § 416.926a(k)(3)(vi).

Here, Gille testified that ringing in her ears disturbs her sleep and that she sleeps five hours a

night at most.  Tr. 991, 998.  Her mother also asserts that Gille has trouble sleeping and stays up

all night.  Tr. 1006.  Moreover, Gille's weight increased significantly from January 2006 until her

hearing, suggesting an unhealthy change in her eating patterns.  Tr. 672, 992.

---

[7] An ALJ's credibility findings must be sufficiently specific to "permit the court to
conclude that the ALJ did not arbitrarily discredit the claimant's testimony."  *Tommasetti*, 533
F.3d at 1039 (citation omitted).  Here, the ALJ's rationale for discrediting Gille's reported
difficulty washing was totally arbitrary.  There is simply no evidence in the record concerning the
extent of Gille's mother's disability or her capacity to assist her daughter in activities of daily
living that could amount to clear and convincing evidence to discredit Gille's allegation.

Second, in the subcategory of "emotional wants and needs" within the domain of "Caring for yourself," Social Security Ruling 09-7p observes that children with mental impairments such as anxiety disorder may "use denial or escape rather than problem-solving skills to deal with a stressful situation." S.S.R. No. 09-07p, 2009 WL 396029, at *3. Here, Gille's testimony that she mostly stays home because she gets "worked up" around people demonstrates her inability to respond appropriately to her mental impairments. Tr. 982.

Third, Social Security Ruling 09-7p notes that, depending on the child's age, a failure to spontaneously pursue enjoyable activities or interests could demonstrate a limitation in this domain. 2009 WL 396029, at *6. In May 2005, when Gille first applied for benefits, she stated that she was able to work on art projects and keep busy on her own. Tr. 130. By the date of her hearing, however, she testified that she no longer worked on art or writing, her previous recreational activities. Tr. 999. Her failure to pursue those pastimes also indicates her limited ability to care for herself.

Finally, Social Security Ruling 09-7p states that a typical adolescent "feels more independent from others and becomes increasingly independent in all daily activities." 2009 WL 396029, at *6. Here, Gille appears to have become less rather than more independent, as she now requires assistance from her mother with daily activities such as cleaning, cooking, and organizing and taking medications. Tr. 209-215.

The ALJ erred by discrediting this evidence concerning Gille's inability to care for herself. Once a claimant produces medical evidence of an underlying impairment, an ALJ may not reject the claimant's subjective complaints based solely on a lack of medical evidence to fully

corroborate the alleged severity of the impairment. *Robbins v. Soc. Sec. Admin.* 466 F.3d 880, 883 (9th Cir. 2006); *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004). Unless the record has affirmative evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). Here, the ALJ acknowledged Gille produced medical evidence of her underlying impairments, Tr. 19, and I find no affirmative evidence of malingering. Thus, the ALJ had a duty to state specific, clear and convincing reasons to reject Gille's testimony about her sleeping and eating disturbances, her inability to adapt to her anxiety, her abandonment of pleasurable activities, and her increasing dependence on her mother. He provided no such justifications.

Given that the ALJ improperly applied the incorrect standard for addressing the domain of "Caring for yourself" and improperly discredited Gille's testimony about her limitations in that domain, the only remaining question is whether to remand for further administrative proceedings or for an award of benefits. "[T]he district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (citing *Harman v. Apfel,* 211 F.3d 1172, 1174, 1178 (9th Cir. 2000)). All three requirements for a remand for award of benefits are met in this case. First, as discussed above, the ALJ

improperly rejected Gille's subjective complaints.  Second, there are no outstanding issues to be

resolved before Gille may be found disabled under the childhood disability standard.  Finally, as

discussed above, it is clear from the record that, had the ALJ credited Gille's testimony, he would

have found at least a marked limitation in Gille's ability to care for herself.  Given that the ALJ

also found a marked limitation in the domain of health and physical well-being, the ALJ would

be required to find that Gille's combination of severe limitations functionally equaled the listings

and, thus, to deem her disabled.  *See* 20 C.F.R. § 416.926a (a) (marked limitations in two

domains functionally equals the listings); 20 C.F.R. § 416.924(d)(1) (a claimant with an

impairment that functionally equals the listings will be found disabled).  Accordingly, the

Commissioner's childhood decision should be reversed and remanded for a finding of disability

and an award of benefits.

## II.        Adulthood Decision

### A.        Updated Psychological Evaluation

"In Social Security cases the ALJ has a special duty to fully and fairly develop the record

and to assure that the claimant's interests are considered."  *Brown v. Heckler*, 713 F.2d 441, 443

(9th Cir. 1983) (citation omitted).  "Ambiguous evidence, or the ALJ's own finding that the

record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to

conduct an appropriate inquiry."  *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir.  2001)

(ALJ erred when he relied on physician's equivocal testimony and ignored the physician's

concerns that the record was inadequate to assess the claimant's mental impairments).  "A

specific finding of ambiguity or inadequacy of the record is not necessary to trigger this duty to

inquire, where the record establishes ambiguity or inadequacy." *McLeod v. Astrue*, — F.3d —,
2011 WL 1886355, at *3 (9th Cir. May 19, 2011). At the same time, the Commissioner has
broad latitude in ordering a consultative examination and is not required to pay for an
examination in every case. *Reed v. Massanari*, 270 F.3d 838, 842 (9th Cir. 2001).

   In his decision, the ALJ reviewed the record pertaining to Gille's psychological
conditions in adulthood. Initially, he noted that Gille was discharged from Clackamas County
Mental Health Services shortly after her 18th birthday, chose not to utilize psychological
treatment, therapy, or medication, and ignored treatment recommendations of her counselor. Tr.
33. Consequently, the ALJ discredited the extent of Gille's alleged anxiety and depression. Tr.
33. He also observed that Gille's mental health provider diagnosed her with depressive disorder,
not anxiety or somatoform disorder as did other mental health professionals. Tr. 34. Next, the
ALJ noted that agency reviewing psychologist Dr. Dorothy Anderson affirmed that Gille was not
psychologically disabled, although she had mild depression and mild to moderate anxiety. Tr.
34. The ALJ also relied on Dr. deVidal's evaluation eight months before Gille turned 18, noting
that deVidal rendered a qualified diagnosis of somatoform disorder, along with mood and anxiety
disorders. *Id.* The ALJ concluded by reasoning that "there is consistent and substantial evidence
that [Gille] had difficulty around groups of people" but finding no "expert psychological opinion
supporting the existence and extent of claimant's alleged symptoms." *Id.*

   Gille argues that the record is ambiguous and inadequate for several reasons,
triggering the ALJ's duty to order a second consultative psychological evaluation. First, Gille
relies on Dr. Rullman's testimony at the hearing that he could not assess Gille's functional

FINDINGS AND RECOMMENDATION- Page 32

limitations resulting from her somatoform disorder on the basis of the current record and that

Gille's "very significant" emotional problems "may need additional evaluation." Tr. 1009.

Second, Gille argues that the deVidal evaluation is inadequate because it failed to provide

evidence of Gille's mental functioning in adulthood and it lacked a functional assessment of

Gille's work-related limitations.  Finally, Gille argues that the inconsistencies in the record

regarding whether she has a somatoform disorder and her low GAF score of 50 create ambiguity

about the effects of Gille's mental impairments.

I do not agree with Gille that the record was ambiguous or inadequate to evaluate the

functional limitations caused by her mental impairments.  First, the ALJ was free to reject  Dr.

Rullman's suggestion at the hearing that a new psychological evaluation would be helpful.

Indeed, Dr. Rullman is an internist, not a psychologist; his discomfort with opining about the

functional effects of Gille's psychological conditions does not imply that existing psychological

evidence was insufficient for the ALJ to assess Gille's residual functional capacity.

Second, Dr. deVidal's prior consultative evaluation was adequate to support the ALJ's

findings.  Although deVidal's examination occurred eight months before Gille became an adult

and two and half years before Gille appeared before the ALJ, it addressed most of the same

psychological symptoms that she alleged at the hearing, including somatization disorder, anxiety,

and depression.  Additionally, the fact that Dr. deVidal did not have the opportunity to evaluate

Gille's more recent allegation of agoraphobia does not change my analysis.  The ALJ credited

Gille's testimony about her fear of groups of people and incorporated that limitation into her

residual functional capacity.  Tr. 1009 (Dr. Rullman testifying that Gille had not previously

FINDINGS AND RECOMMENDATION- Page 33

emphasized that complaint); Tr. 32 (Gille's RFC includes "limited exposure to groups of

people").  Also, while Dr. deVidal's evaluation did not include a clear statement of what Gille

could still accomplish in the workplace despite her mental impairments, the lack of such a

functional assessment does not render his report incomplete.  20 C.F.R. § 404.1519n(c)(6)

("Although we will ordinarily request, as part of the consultative examination process, a medical

source statement about what you can still do despite your impairment(s), the absence of such a

statement in a consultative examination report *will not make the report incomplete.*") (emphasis

added).

Finally, the record was not ambiguous about the impacts of Gille's mental

impairments.  As in the ALJ's decision pertaining to Gille's childhood, in this decision the ALJ

construed the seemingly inconsistent medical evidence concerning somatoform disorder in

Gille's favor by accepting that she suffered from that disorder.  Tr. 30 (finding somatoform

disorder to be one of a severe combination of impairments); Tr. 33 (considering Gille's alleged

symptoms "in a somatoform context"); Tr. 34 (noting that Dr. deVidal rendered a qualified

diagnosis of somatoform disorder and observing that "somatoform disorder may explain an

unrealistic interpretation of symptoms").  Moreover, Dr. deVidal's assessment of Gille's GAF

score does not necessarily stand in tension with the ALJ's ultimate finding that Gille was not

disabled.  *See* 65 Fed. Reg. 50746 (Aug. 21, 2000)(addressing comments to rules revising

regulations for evaluating mental impairments and noting that "[t]he GAF scale . . . is the scale

used in the multiaxial evaluation system endorsed by the American Psychiatric Association [and]

does not have a direct correlation to the severity requirements in our mental disorders listings.").

Nor did Gille's own symptom testimony create ambiguity in the record regarding her functional abilities. The ALJ properly discredited the majority of Gille's testimony about the severity of her depression and anxiety because she voluntarily terminated her mental health treatment when she turned 18 years old. S.S.R. No. 96-7p, 1996 WL 374186 (ALJ may permissibly discount a claimant's credibility "if the level or frequency of treatment is inconsistent with the level of complaints."). In sum, the ALJ found most of Gille's psychological symptoms incredible and instead relied on adequate medical expert evidence to assess Gille's residual functional capacity and, ultimately, find her not disabled. Therefore, the ALJ's duty to develop the record was not triggered in this case and he did not err by declining to order a second consultative evaluation.

## CONCLUSION

For the reasons set forth above, I recommend that the Commissioner's final decision pertaining to Gille's childhood be reversed and remanded for a finding of disability and award of benefits and that the Commissioner's final decision pertaining to Gille's adulthood be affirmed. A final judgment should be entered pursuant to sentence four of 42 U.S.C. § 405(g).

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the

Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 16th day of June, 2011.

/s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge